## STATE OF CONNECTICUT *v.* WILLIAM BECKERMAN
## (AC 34670)

Gruendel, Alvord and Flynn, Js.

Argued March 4—officially released September 24, 2013

*Richard Emanuel,* for the appellant (defendant).

*Rocco A. Chiarenza,* assistant state's attorney, with whom, on the brief, were *Gail P. Hardy,* state's attorney, and *Donna Mambrino,* senior assistant state's attorney, for the appellee (state).

*Opinion*

GRUENDEL, J. The defendant, William Beckerman, appeals from the judgment of conviction, rendered after a bench trial, of arson in the first degree in violation of General Statutes § 53a-111 (a) (2) and arson in the first degree in violation of § 53a-111 (a) (4).[1] The defendant claims that the trial court erred by (1) denying his motion in limine to preclude the state from presenting scientific evidence in violation of his due process rights under the United States constitution and the Connecticut constitution, (2) allowing the state to present rebuttal evidence in excess of the proper scope and purpose of such evidence, (3) accepting his invalid waiver of his right to a jury trial, and (4) intervening during trial, thereby depriving him of his right to a fair trial as guaranteed by the fifth and fourteenth amendments to the United States constitution and article first, § 8, of the Connecticut constitution. We affirm the judgment of the trial court.

The following facts are relevant to the defendant's claims on appeal. On February 11, 2009, the defendant returned from a trip to Florida. His business associate and neighbor, Leonard Udolf, picked him up from Bradley Airport to take him to a business meeting the two were planning to attend together. On the way to Udolf's office, where the meeting was to be held, the two men stopped at the defendant's home in West Hartford so that he could turn on the heat. When they arrived at the defendant's home, he entered it through the garage

[1] General Statutes § 53a-111 (a) provides in relevant part: "A person is guilty of arson in the first degree when, with intent to destroy or damage a building . . . he starts a fire or causes an explosion, and (1) the building is inhabited or occupied or the person has reason to believe the building may be inhabited or occupied; or (2) any other person is injured, either directly or indirectly; or (3) such fire or explosion was caused for the purpose of collecting insurance proceeds for the resultant loss; or (4) at the scene of such fire or explosion a peace officer or firefighter is subjected to a substantial risk of bodily injury."

while Udolf waited in the car. According to Udolf, the defendant was in the home for approximately five minutes before returning to the car. When the defendant got back into Udolf's car, he remarked that the house felt cold, so he had turned up the heat and heard the boiler begin running. The men left the defendant's home at approximately 2:45 p.m. and, from there, went to a Subway restaurant to have lunch. Following lunch, the two men attended their scheduled meeting at Udolf's office from approximately 3 p.m. until 3:30 p.m.

Meanwhile, at 2:53 p.m., fire station four in West Hartford received a report of a home on fire at 27 The Crossways, the defendant's home address. Upon arriving at the scene of the fire, firefighters concluded, based on observing that the smoke was emanating from the foundation of the house and basement windows, that the fire was located in the basement. The first crew to enter the home encountered an entirely smoke filled first floor, forcing them to crawl on their hands and knees to search for potential victims trapped inside the home. After ventilating the house, firefighters were able to observe that flames engulfed with "significant force" the entire doorway leading to the basement staircase. Following his determination that the structural integrity of the stairs to the basement had been compromised, Christopher Gordon, a lieutenant with the West Hartford Fire Department, concluded that it would be unsafe for his crew to attempt to descend the stairs to the basement in order to fight the fire at its source. Gordon and his crew then exited the residence to replace the cylinders of their air packs and a second crew entered the building.

Having replaced his air pack, Gordon, then aided by firefighter David Quick, attempted to prevent the fire from spreading to the first floor by applying water to the area around the doorway. While manning the hose during this operation, Gordon and Quick experienced

an explosion that knocked Quick backward from the doorway and burned his face. At that point, Gordon decided to change their approach and attempt to fight the fire from outside the home. The crew outside the residence experienced the explosion as well. They observed, following the explosion, a fireball burst out of the basement window and burn firefighter Gregory Hill.

After fighting the fire for more than one hour to no avail, Michael Sinsigalli, assistant fire chief, ordered the crews to suspend their firefighting efforts until the first floor of the home collapsed into the basement, a common strategy employed when firefighters, as here, were without direct access to the source of the fire. Approximately ninety minutes later, the first floor collapsed and firefighters were able to gain control over the fire shortly thereafter. In the end, five firefighters sustained injuries while attempting to extinguish the fire. Despite being notified that his house was on fire, the defendant declined to go to the scene.

The following day, February 12, 2009, John Sawyer, a detective with the state fire marshal's office, initiated his investigation of the fire. Sawyer began by interviewing the defendant at the West Hartford police station, where the defendant provided him with a sketch of his home and an account of his activities before and during the fire. The defendant indicated that he believed the fire was caused by a furnace malfunction and that he had experienced problems with the furnace in the past. While interviewing him, Sawyer also obtained the defendant's written consent to search the home.

After having an excavator remove the debris remaining from the first floor collapse, Sawyer accessed the home in order to uncover the cause and origin of the fire. Having determined from the pattern of fire damage that the source of the fire was in the basement, he undertook a thorough examination of that area. He

determined that the furnace could not have been the origin of the fire because it appeared to be relatively unharmed: the paint and labels on the exterior of the furnace, along with the plastic emergency switch were intact and there was little damage to its wiring or insulation. He discovered, moreover, that the flue pipe appeared to lack defects or abnormalities.

While inspecting the basement, Sawyer found a dresser in the furnace room. He noticed that the dresser drawers had been removed and that brown paper filled the cavities where the drawers formerly sat. The paper weaved inside the openings of the dresser, extended to a nearby couch and extended further still to the top of a lawn mower. Sawyer determined that the paper had been arranged in this way to act as a "trailer" to aid in spreading the fire.

Having failed to determine with any certainty the cause of the fire, on February 13, 2009, Sawyer brought to the home his canine trained in detecting the presence of accelerants. Lily, Sawyer's canine, alerted to the presence of petroleum distillate in four locations in the basement: the wall and floor of the "bar room," on the couch, the second step of the staircase leading from the basement to the first floor and the area in front of the furnace. Sawyer took samples from all of these locations except for the area in front of the furnace, as he expected to find traces of home heating oil there. Sawyer later sent the samples for testing to Jack Hubball, a chemist at the state police forensic laboratory, who determined that all of the samples substantiated the presence of a cocktail of gasoline and kerosene. Sawyer, having eliminated all natural or accidental causes of the fire, including electrical or furnace malfunction, concluded that the cause of the fire was "intentional of human design" and that the origin of the fire was at the bottom of the stairs leading to the basement.

After Lily indicated that several areas in the basement had traces of accelerants, Sawyer met with the defendant at a local Dunkin' Donuts in order to glean more information about his home and his activities leading up to the fire. The defendant, during this meeting, provided Sawyer with a written statement detailing his arrival at Bradley Airport, his short visit to his home to turn on the heat, his observations that there did not appear to have been any person in or near the home and his subsequent lunch and meeting at Udolf's office. In the written statement, he also described the history of furnace repairs and an alleged leak in the furnace that caused an oil spill that he cleaned up with paper towels.

Thereafter, the defendant was arrested and charged with one count of first degree arson. The state, at the start of trial, filed a long form information charging the defendant with an additional count of arson.[2] After a trial before the court, the defendant was found guilty of both counts and judgment was rendered accordingly. The court sentenced the defendant to ten years of incarceration for each count, to be served concurrently, and a $20,000 fine for each count, resulting in a total effective sentence of ten years of incarceration and $40,000 in fines. From this judgment the defendant now appeals.

I

MOTION TO EXCLUDE STATE'S EVIDENCE

The defendant first claims that the court improperly denied his motion to suppress the evidence obtained during Sawyer's canine search for accelerants.[3] Specifically, he argues that under the due process clause of

[2] The original information charged the defendant with a single count of first degree arson in violation of § 53a-111 (a) (2), (3), and (4). The long form information filed on January 27, 2010, charged the defendant with one count of first degree arson in violation of § 53a-111 (a) (2) and a second count of first degree arson in violation of § 53a-111 (a) (4).

[3] Although denominated a "motion in limine," the parties agree that it was, in substance, a motion to suppress the state's evidence, and the court treated it as such, as will we. See *Whalen* v. *Ives*, 37 Conn. App. 7, 16, 654

the fourteenth amendment to the federal constitution and article first, §§ 8 and 9, of the Connecticut constitution, the state had a duty to preserve for testing a sample of the area around the furnace where Lily alerted to the presence of accelerants, and that, because it failed to do so, the court improperly permitted the state to introduce the evidence gleaned from those samples. We disagree.

Before trial began, the court held a hearing on the defendant's motion to suppress the evidence gathered during the canine search of the defendant's home. Sawyer testified during the hearing that although Lily alerted to the area around the furnace, he did not believe it was necessary to take a sample of that flooring. He explained that even if testing of the sample revealed the presence of accelerants in that area, that would have no bearing on the investigation because one would expect to find traces of accelerants in the area surrounding a furnace, and surrounding this furnace in particular, in light of the defendant's assertion that the furnace had leaked in the past.

The court, in denying the defendant's motion, found that Sawyer's failure to take a sample "did not deprive [the defendant] of his due process rights to a fair trial." Noting that the defendant's expert, who testified to smelling home heating oil when he inspected the home, could have taken a sample for testing himself, but declined to do so, the court concluded that Sawyer's failure to take the sample did not prevent the defendant from making his own case. The court also found no bad faith with respect to Sawyer's behavior,[4] that it was

A.2d 798 (we look to substance of claim rather than form), cert. denied, 233 Conn. 905, 657 A.2d 645 (1995).

[4] The defendant's trial counsel conceded that Sawyer's failure to take the sample was not a decision made in bad faith. During argument on the motion, he stated: "I'm not suggesting for a moment that . . . Sawyer acted in bad faith, and I just want the record to be clear [on] that, not for a moment, nor am I suggesting anything inappropriate."

"not an intentional effort . . . to defeat the defendant's assertion that this was a [furnace] fire" and did not "even amount to negligence."

"The standard of review in connection with the court's denial of a motion to suppress is well settled. . . . This involves a two part function: where the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision; where the factual basis of the court's decision is challenged we must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous. That is the standard and scope of this court's judicial review of decisions of the trial court. Beyond that, we will not go. . . . In other words, to the extent that the trial court has made findings of fact, our review is limited to deciding whether those findings were clearly erroneous. Where, however, the trial court has drawn conclusions of law, our review is plenary, and we must decide whether those conclusions are legally and logically correct in light of the findings of fact." (Internal quotation marks omitted.) *State* v. *Kaminski*, 106 Conn. App. 114, 124–25, 940 A.2d 844, cert. denied, 287 Conn. 909, 950 A.2d 1286 (2008).

The defendant makes the blanket argument that the court's denial of his motion to suppress the state's evidence violated his due process rights under both the federal and state constitutions.[5] The United States

[5] The defendant also alleges a violation under our state constitution, relying principally on *State* v. *Morales*, 232 Conn. 707, 657 A.2d 585 (1995). In *Morales*, our Supreme Court "set forth the analytical path for determining whether the failure of the police to preserve evidence constitutes a due process violation under our state constitution. . . . [T]he court expressly rejected the federal standard of *Arizona* v. *Youngblood*, 488 U.S. 51, 58, 109 S. Ct. 333, 102 L. Ed. 2d 281 (1988). The court . . . held that the good or bad faith of the police in failing to preserve potentially useful evidence cannot be dispositive of whether a criminal defendant has been deprived of due process of law. . . . Rather, in determining whether a defendant has been afforded due process of law under the state constitution, the trial court must employ the [*State* v. *Asherman*, 193 Conn. 695, 724, 478 A.2d 227 (1984), cert. denied, 470 U.S. 1050, 105 S. Ct. 1749, 84 L. Ed. 2d 814 (1985)] balancing test, weighing the reasons for the unavailability of the evidence against the degree of prejudice to the accused. More specifically, the trial

Supreme Court has determined that "[t]he [d]ue [p]rocess [c]lause of the [f]ourteenth [a]mendment, as interpreted in *Brady* [v. *Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963)], makes the good or bad faith of the [s]tate irrelevant when the [s]tate fails to disclose to the defendant material exculpatory evidence. But . . . the [d]ue [p]rocess [c]lause requires a different result when we deal with the failure of the [s]tate to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant. Part of the reason for the difference in treatment is . . . that [w]henever potentially exculpatory evidence is permanently lost, courts face the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed. Part of it stems from our unwillingness to read

court must balance the totality of the circumstances surrounding the missing evidence, including the following factors: the materiality of the missing evidence, the likelihood of mistaken interpretation of it by witnesses or the jury, the reason for its nonavailability to the defense and the prejudice to the defendant caused by the unavailability of the evidence." (Citation omitted; footnote omitted; internal quotation marks omitted.) *State* v. *Thompson*, 128 Conn. App. 296, 301–302, 17 A.3d 488 (2011), cert. denied, 303 Conn. 928, 36 A.3d 241 (2012). In his appellate brief, the defendant argues that the state's failure to collect a sample from the canine alert area around the furnace violated his right of access to evidence based upon the foregoing test.

As our Supreme Court has explained, "it is well established that there are two areas of constitutionally guaranteed access to evidence such that denying or foreclosing the defendant's access to that evidence may constitute a due process violation. . . . The first situation concerns the withholding of exculpatory evidence by the police from the accused. . . . The second situation . . . concerns the failure of the police to preserve evidence that might be useful to the accused." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *State* v. *Johnson*, 288 Conn. 236, 275–76, 951 A.2d 1257 (2008). The defendant claims that the second situation is implicated in the present case. We disagree. First, this case is not one in which the state at one time had exclusive possession over certain evidence that later was destroyed or permanently lost and is otherwise unavailable. Contra *State* v. *Joyce*, 243 Conn. 282, 300, 705 A.2d 181 (1997), cert. denied, 523 U.S. 1077, 118 S. Ct. 1523, 140 L. Ed. 2d 674 (1998); *State* v. *Richard W.*, 115 Conn. App. 124, 139–42, 971 A.2d 810, cert. denied, 293 Conn. 917, 979 A.2d 493 (2009). Second, the potential evidence was such that it could have been obtained by the defendant or his representatives, including Higgins, at any time by visiting the area in question in the defendant's basement. To constitute a failure to preserve evidence, the evidence must be of "such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *California* v. *Trombetta*, 467 U.S. 479, 489, 104 S. Ct. 2528, 81 L. Ed. 2d 413 (1984); *State* v. *Scott*, 16 Conn. App. 172, 179–80, 547 A.2d 77, cert. denied, 209 Conn. 821, 551 A.2d 758 (1988). Because the evidence in question fails to meet that standard, the defendant's state constitutional claim is untenable. Accordingly, we review the defendant's due process challenge under the federal constitution.

the fundamental fairness requirement of the [d]ue [p]rocess [c]lause . . . as imposing on the police an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution. . . . [R]equiring a defendant to show bad faith on the part of the police both limits the extent of the police's obligation to preserve evidence to reasonable bounds and confines it to that class of cases where the interests of justice most clearly require it, *i.e.*, those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant. We therefore hold that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." (Citation omitted; emphasis in original; internal quotation marks omitted.) *Arizona* v. *Youngblood*, 488 U.S. 51, 57–58, 109 S. Ct. 333, 102 L. Ed. 2d 281 (1988).

Even if we assume arguendo that the circumstance presented in this case falls within the ambit of those cases where there is a duty to preserve evidence,[6] the defendant's claim is, nonetheless, unavailing. In light of the court's unchallenged finding that there was no bad faith underlying Sawyer's failure to take a sample of the area near the furnace, we cannot conclude that the court improperly denied the defendant's motion to suppress the state's evidence obtained as a result of the canine search.

## II

## REBUTTAL EVIDENCE

The defendant next claims that the court erred in allowing the state to present improper rebuttal evidence. He contends that the court improperly permitted

[6] The argument advanced by the defendant appears to rest on the premise that the state has a duty to *collect* evidence, rather than simply to preserve evidence that has been collected in the course of an investigation. We need

the state to offer the testimony of Michael Hennessy, an arson investigator, in its rebuttal case, when the state should have presented his testimony in its case-in-chief. We disagree.

During the state's case-in-chief, Sawyer testified that in the course of his investigation of the fire scene he observed a lawn mower in the basement that had paper strewn across it, which appeared to him to have been used as a "trailer" to spread the fire. After the defendant's cross-examination of Sawyer, the court asked whether Sawyer had inspected the lawn mower itself, to which Sawyer responded that he had not. On redirect examination, Sawyer testified that he did not examine the lawn mower itself because he did not see fire damage to it. Rather, he testified, he observed that the mower was covered in brown paper that remained unburned.

As part of the defendant's case-in-chief, he offered the expert testimony of Michael Higgins, a fire investigator employed by K-Chem Laboratories. During the direct examination of Higgins, counsel for the defendant elicited testimony regarding Higgins' opinion as to the cause and origin of the fire. Higgins testified that, on the basis of his investigation, he believed the fire was caused by a "small explosion" in the defendant's faulty furnace, created by a buildup of soot in the flue pipe.

Higgins also testified about his investigatory process and about the evidence upon which he ultimately based his conclusions with respect to the cause and origin of the fire. He explained that based on the burn patterns he observed during his investigation, in his opinion, the fire originated in the furnace room, rather than at the bottom of the basement stairs, as Sawyer had opined. He also testified that Lily's alerts to the several locations

not weigh in on the merits of this argument, as the defendant's claim fails on other grounds.

within the basement were caused by the firefighters' fire suppression efforts, particularly that the water which ultimately filled the basement tainted the entire area with the residue of petroleum products. Higgins testified that he inspected the dresser containing the brown construction paper and determined that it had not acted as a trailer because much of it was unburned. In fact, he opined, the paper did not contribute to the cause or spreading of the fire in any way.

Higgins also offered testimony regarding a lawn mower that he discovered in the basement during the course of his investigation. Referring to photographs accepted into evidence, he testified that the gasoline operated lawn mower was not consumed in the fire and that, in his opinion, it was not involved in the creation or spreading of the fire. Higgins also testified that he disagreed with Hubball's conclusions regarding the presence of gasoline and kerosene in the basement, to which he had testified during the state's case-in-chief. Specifically, he determined that the chromatograms produced by Hubball indicated that there was a negligible amount of gasoline present in the samples obtained by Sawyer. He further testified that he believed the explosion that injured the firefighters was caused by the bursting of a sealed container of kerosene that the defendant likely stored in the basement.

At the end of Higgins' direct examination, the court engaged in the following colloquy with counsel regarding the prospect of the state's rebuttal to Higgins' testimony:

"The Court: As it stands now, do you have any idea about rebuttal?

"[The Prosecutor]: Oh, yeah.

"The Court: Okay, Yeah. I'm not surprised. . . .

"[The Prosecutor]: I had anticipated my rebuttal was going to be short, it's not going to be any longer.

"The Court: Okay.

"[Defense Counsel]: And just—and just for the record . . . I know it's unusual, but to the extent the rebuttal is—represents essentially the introduction of new evidence—

"The Court: Wait. Wait a minute. Where are you going? What are you . . . .

"[Defense Counsel]: Okay. I'm just going to request the opportunity if they're raising entirely new issues that weren't raised in their case-in-chief and could have been raised in their case-in-chief, then I'm going to ask for the opportunity to introduce surrebuttal, and Your Honor has a discretionary authority to do that."

Following the defendant's case-in-chief, the court ordered the parties to present argument on the purpose and scope of rebuttal, in particular with respect to Higgins' testimony about the lawn mower and the inspection of the furnace. On February 17, 2010, the court held a hearing on the issue of the state's rebuttal. The state explained that it intended to offer the testimony of Hennessy, a private fire investigator hired by the defendant's insurance company to conduct a cause and origin investigation, in order to rebut the testimony of Higgins that the fire was caused accidentally by the faulty furnace. According to the state, Hennessy would testify regarding his opposing conclusions about the cause and origin of the fire.

The defendant argued that allowing such testimony would be improper because it constituted the bolstering of the state's case-in-chief, specifically, the testimony of Sawyer. He argued further that because the state was aware of Hennessy's conclusions regarding the fire for the entire pendency of the case, permitting the state

to present his testimony on rebuttal would be an abuse of the court's discretion. During the hearing, the court asked the state whether it had "always planned to try the case in this fashion, [to] hold these witnesses back and use them as rebuttal . . . or [was it] waiting to see how . . . Higgins did . . . ?" The state responded that it did not intend to call Hennessy originally, but now saw the need for his testimony on the basis of having heard Higgins testify. As the state explained, "because . . . Hennessy . . . would testify to . . . the same thing that the fire marshal concludes . . . [it] wouldn't be putting that on in [its] case-in-chief for corroborative purposes. [It] would be putting it on now because [it] ha[d] a witness by the defense who ha[d] stated the exact opposite . . . ." After a short recess, the court found that although the state could have called Hennessy during its case-in-chief, it properly could offer his testimony as rebuttal to Higgins' testimony. The defendant requested, in light of the court's ruling, latitude in presenting surrebuttal. The court agreed, stating that it "would be very flexibl[e] because it's a court trial" and if the defendant had evidence "that rebuts the rebuttal, [it would] listen to it . . . even if it [took] time to develop it."

Thereafter, the state called Hennessy in rebuttal on February 23, 2010. He testified that in the course of his investigation he observed in the defendant's basement a dresser, a couch and a lawn mower with paper draped over them. Hennessy opined that the paper acted as a "trailer" to spread the fire. He further testified to having observed that the lawn mower had the gasoline cap removed and remnants of brown paper similar to that which was draped over the dresser and couch "on top . . . where the gas cap would have sat . . . that appear[ed] to have been inserted into the throat of the gas tank." He also testified that the burn patterns he observed were "consistent with localized fire and the

use of a flammable liquid on the left-hand side of [the basement] stairs." Hennessy testified that he ultimately was able to rule out all potential accidental causes of the fire and had determined to a scientific degree of certainty that the fire was incendiary in nature.

After excusing Hennessy, the court addressed the issue of the defendant's surrebuttal, stating: "[M]y current intention is to allow pretty much whatever you want. I'm not going to limit rebuttal. . . . I can listen to whatever evidence and put it in its proper place . . . ." On March 5, 2010, the defendant recalled Higgins to rebut Hennessy's testimony. He largely reaffirmed the testimony that he offered during the defendant's case-in-chief, reiterating that the cause of the fire was accidental and attributable to the malfunctioning furnace. In response to Hennessy's testimony specifically, Higgins testified that he was not present nor was he aware of any witnesses present when Hennessy removed and inspected the gasoline tank of the lawn mower and that Hennessy conducted a portion of his investigation in the presence of Sawyer. He also testified that, to his knowledge, Hennessy was required to report to the police the paper he discovered in the lawn mower's gasoline tank, the report of which did not appear in any of the police records. He also testified that, in his opinion, the lawn mower's gasoline cap could have come off during the fire and that the mower was not an origin of the fire. Moreover, he testified, the brown paper in and between the dresser, couch and lawn mower did not act as a "trailer."

After the court excused Higgins, it engaged in the following colloquy with defense counsel regarding the remainder of the defendant's surrebuttal case:

"The Court: You figure out if you want time . . . for—because the way the case was tried with the state putting on Sawyer and those witnesses, and then not

putting on Hennessy and [Bruce] MacKay [an expert witness for the state] until the rebuttal and you not knowing about the substance of their testimony, you can't figure out what they're going to testify to from the pictures, and not seeing any reports, they never wrote any reports, you're not informed of what the substance of their testimony is going to be.

"You're entitled to—you're entitled to do your job as an attorney, you know, investigate, consult. If you had known about this from the beginning, of course, we wouldn't be doing all this. So, think about it.

"[Defense Counsel]: Okay."

After a short recess, the court continued the colloquy:

"[Defense Counsel]: Your Honor, the defense rests.

"The Court: Okay. Now, just so the record's crystal clear, as I indicated before the recess, I would have given you time to consult with anybody else that you wanted to. You're not interested in that?

"[Defense Counsel]: Well, I didn't know, frankly, how much to impose on the court.

"The Court: You know what, like I've said before here, I don't know how many times I've got to say this . . . I'm not going to rush through anything like this. . . . I really don't know what you're thinking, but I know that in all of the—everything that I've ever read about trials involving people's lives and the issues that go with that, I've never read anything about a stopwatch. I'm not on any schedule.

"The case—the state peeled away the skin on this case like it was an onion, and, you know, it was revealed as it went along, which, I guess, they're entitled to do, but when the case is presented in that way, you're entitled to investigate, consult."

The defendant then requested that the court allow him until March 10, 2010, to make his decision regarding the remainder of his surrebuttal. The court granted his request and adjourned the proceedings until then.

The defendant thereafter called one additional surrebuttal witness, Anthony Caruso, Jr., a carpenter who had helped remodel the defendant's basement. He testified that he had moved the lawn mower from the garage to the basement sometime in December, 2005, or January, 2006. Caruso also testified that he had removed the drawers and put the brown paper in the dresser and on the couch so that he could lay down mouse poison, as the room was infested with mice. He testified, however, that he had not been in the defendant's basement since 2006. Following Caruso's testimony, the defendant rested his surrebuttal.

"Rebuttal evidence is that which is offered to meet new matters raised in [a defendant's case], to contradict prior testimony and to impeach or rehabilitate witnesses . . . . The admission of rebuttal evidence lies within the discretion of the trial court. The issue on appeal is not whether any one of us, sitting as the trial court, would have permitted the disputed testimony to be introduced. The question is rather whether the trial court . . . abused its discretion in . . . allowing the rebuttal testimony . . . ." (Internal quotation marks omitted.) *State* v. *Damato*, 105 Conn. App. 335, 361, 937 A.2d 1232, cert. denied, 286 Conn. 920, 949 A.2d 481 (2008). "This court will affirm a trial court's admission of rebuttal evidence which would have been normally presented as part of the case-in-chief unless the party claiming error sustains his burden of establishing harmful error." *State* v. *Lisella*, 187 Conn. 335, 337–38, 445 A.2d 922 (1982).

We begin by addressing the question of whether the court's alleged error was harmful to the defendant, as

without establishing harm, the defendant cannot prevail. The court afforded the defendant wide latitude to present a surrebuttal after the state offered Hennessy's testimony. In fact, the court encouraged the defendant to do so, even granting him a continuance to contemplate his surrebuttal. The defendant had the opportunity to present his own expert witness' testimony to refute Hennessy's testimony, and did so when he recalled Higgins. Moreover, Caruso's testimony allowed the defendant to present an alternate explanation for the presence of the brown paper that Hennessy had concluded was a "trailer." Given the defendant's virtually limitless opportunity to present his surrebuttal, we cannot conclude that he has established that the court's decision to permit Hennessy to testify as a rebuttal witness was harmful. Accordingly, the defendant's claim fails.

## III

## WAIVER OF JURY TRIAL

We turn next to the defendant's claim that the court failed to ensure that his waiver of his right to a jury trial was knowing, voluntary and intelligent pursuant to the federal constitution,[7] General Statutes § 54-82b and Practice Book § 42-1. Specifically, he argues that despite having knowingly, voluntarily and intelligently waived his right to a jury trial initially, once the state filed a long form information adding a second count of arson in the first degree, his initial valid waiver was "abandoned" and, accordingly, his reaffirmation of the

---

[7] In his brief to this court, the defendant makes passing reference to the claim that the trial court's canvass was inadequate, and, therefore, in violation of article first, § 19, of the Connecticut constitution. He does not, however, provide independent analysis of his state constitutional claim. We, accordingly, deem his claim under the state constitution abandoned. See *State* v. *Pierre*, 277 Conn. 42, 74 n.12, 890 A.2d 474 ("[w]ithout a separately briefed and analyzed state constitutional claim, we deem abandoned the defendant's claim" [internal quotation marks omitted]), cert. denied, 547 U.S. 1197, 126 S. Ct. 2873, 165 L. Ed. 2d 904 (2006).

original waiver following the state's filing of the long form information was an invalid waiver. In light of our holding in *State* v. *Dalton*, 100 Conn. App. 227, 234–35, 917 A.2d 613, cert. denied, 282 Conn. 913, 924 A.2d 139 (2007), we disagree.

On January 13, 2010, the defendant appeared before the court, *Gold, J.*, in order to elect a bench trial. The court thoroughly canvassed the defendant to ensure that the waiver of his right to a jury trial was knowing, voluntary and intelligent.[8] On January 27, 2010, the state

[8] The court conducted the following canvass before accepting the defendant's election of a bench trial:

"The Court: . . . [I]t's my understanding, Mr. Beckerman, that you've decided that you wish to have this case heard by Judge O'Keefe as a court rather than present your case to a jury. Is that right?

"The Defendant: Yes.

"The Court: All right. I need to ask you a series of questions about that decision to make sure that this is a decision that you're making knowingly, voluntarily and of your own free will. Now, Mr. Beckerman, to this point you had indicated that you wished your charges to be resolved by a jury. On a charge like this you would have been entitled to have a jury decide whether or not the state met its burden of proof and whether or not you are guilty or not guilty. . . .

"The Defendant: Yes.

"The Court: . . . And today you're telling me that you've decided to exercise one of your constitutional rights and that's the right to have your case heard by a judge rather than a jury.

"The Defendant: Yes.

"The Court: Let me ask you this first: Are you under the influence of anything right now that in any way interferes with your ability to make a rational decision in this regard and to make a knowing choice?

"The Defendant: No.

"The Court: Have you had enough time to discuss this matter with Attorney [David R.] Kritzman?

"The Defendant: Yes.

"The Court: And when I say this matter, I mean, specifically, the decision to change your election to a court trial. Have you?

"The Defendant: Yes.

"The Court: And has Mr. Kritzman answered all the questions that you might have had about this decision and talked to you about the pros and cons of each course of action?

"The Defendant: Yes.

"The Court: Now, I just want you to understand that this is a decision that is to be made by the defendant, him or herself. Certainly, the defendant

### filed a long form information that included an additional

who makes this decision is entitled to discuss it with his lawyer, and should discuss it with his lawyer, and is certainly entitled to heed his lawyer's advice if he believes it's sound. But even if your lawyer is recommending that you have a court trial, a trial to a judge, and you are of the mind that it should be a jury trial, this is a decision that you have to make.

"You can obviously make it after considering the options and after discussing it with your lawyer, but at the end of the day, it's your call. So, even if your lawyer says, I· think we should get a court trial, and even if you generally do what your lawyer says, if you say you want a jury trial, then a jury trial it is. So, I want to make sure that you understand that this is your decision. Do you understand that?

"The Defendant: Yes, Your Honor. I thought it out and made that decision.

"The Court: And the decision is to change your election—

"The Defendant: Yes.

"The Court: —to a court trial.

"The Defendant: Yes.

"The Court: All right. Just one other matter that I'd like to cover on this topic is the fact—and I'm sure you've considered this because you just told me you thought it out—there is a significant difference between a court trial and a jury trial, and it's obvious what the difference is. When it's a jury trial, you, along with Mr. Kritzman, would get to pick, through the process we call voir dire, who the jurors are going to be. You know, jurors would come in as prospective jurors, and you could ask questions through Mr. Kritzman and decide, yes, I want this person on the jury but I don't want that person. And when you change to a court trial, obviously it's just going to be one judge and that whole process is not going to take place. Do you understand that difference?

"The Defendant: Yes.

"The Court: And the other difference is, of course, that because there's only going to be one judge, whatever that judge decides, that's what the verdict is. So, if the judge says, I've listened to the evidence and I think the state has proven the case beyond a reasonable doubt, then the judge is going to find you guilty. If the judge does not believe that the state has met its burden, you'll be found not guilty. But it's a decision that's made by one person. Whereas on the jury side, this would be a jury of six people, and all six of the jurors would have to agree before you could be found guilty or, for that matter, before you could be found not guilty. And if the six all couldn't come to the same decision as to whether or not the state had met its burden of proof, then it would be a hung jury and there would be a retrial. You understand that distinction?

"The Defendant: Yes.

"The Court: So, the distinction is six people would have had to agree that you were guilty before you could be found guilty, if it was a jury. And by changing your election to the judge, whatever the judge says goes, so to speak. Do you understand that?

count of arson in the first degree. The defendant pleaded not guilty to the additional charge and again waived his right to a jury trial, electing instead to be tried before the court. Before accepting his waiver, the court, *O'Keefe, J.*, engaged in the following colloquy with the defendant, his trial counsel, David R. Kritzman, and the state's attorney, Donna Mambrino:

"The Court: "[The defendant's] already been canvassed on his court election. Right?

"[Defense Counsel]: Yes, he has.

"The Court: This doesn't—there's a count two. Was there a count one and two in the original information?

"[Defense Counsel]: No.

"[The Prosecutor]: It was only count one, but it was— but it was every one of the subsections there—or three subsections; that's what it was.

---

"The Defendant: Yes, I do.

"The Court: Now, having had time to think about those differences that I've commented on and having discussed with Mr. Kritzman the pros and cons, have you decided that it is your personal decision to change your election and ask the matter be heard by the judge alone?

"The Defendant: Yes, I do, Your Honor.

"The Court: Do you have any questions on this issue that you want to ask me?

"The Defendant: No.

"The Court: Is anyone forcing you to make this change?

"The Defendant: No.

"The Court: Has anyone threatened you in any way in order to induce you to make the change of election?

"The Defendant: No.

"The Court: You're making this decision—it's a decision you're making of your own free will and accord knowing it's your decision to make. Correct?

"The Defendant: Yes, Your Honor.

"The Court: Anything else you suggest I canvass on?

"[The Prosecutor]: Not with respect to this issue, Your Honor.

"The Court: Mr. Kritzman, anything else you suggest I canvass on—

"[Defense Counsel]: No. Thank you, Your Honor."

"The Court: Okay. . . . [I]t's not exactly the same as what he was canvassed on when he made his court election. . . . [D]o you still—do you want to—

"[Defense Counsel]: Well, there was a thorough—

"The Court: Do you want to talk to your—

"[Defense Counsel]: There was a thorough canvassing by Judge Gold. If you wish to canvass him again—

"The Court: No. No.

"[Defense Counsel]: I'm not requesting it.

"The Court: I'm asking you.

"[Defense Counsel]: No, thank you. I appreciate the offer.

"The Court: Do you—and I want you to ask your client, do you see any problem—

"[Defense Counsel]: Would you like me to . . . inquire?

"The Court: Yeah. . . .

"[Defense Counsel]: I have informed my client.

"The Court: Okay. He understands that this is—this is different than the—what he originally faced because this is two counts and the other was one count.

"[Defense Counsel]: Correct.

"The Court: And if he wished, I would send you back to Judge Gold for a further canvass on the change in election. He doesn't want to do that?

"[Defense Counsel]: No, he doesn't, Your Honor.

"The Court: He's satisfied with the entry of the not guilty pleas?

"[Defense Counsel]: Yes.

"The Court: And still wants to proceed with a court trial?

"[Defense Counsel]: Yes.

"The Court: Is that right, Mr. Beckerman?

"The Defendant: Yes.

"The Court: Okay. Any questions about that?

"The Defendant: No."

The court permitted the matter to proceed to a bench trial, after which the defendant was found guilty and judgment of conviction was rendered with respect to both counts of arson in the first degree. The defendant now challenges the validity of his second waiver.

Acknowledging that he failed to preserve this claim for review, he now seeks review under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), or the plain error doctrine. See Practice Book § 60-5. As we have determined that the record provided by the defendant is adequate for our review and his claim is of constitutional magnitude, we will review his claim. We are unable, however, to conclude that the defendant has satisfied the third prong of *Golding*, in that he has not shown that a constitutional error clearly exists.[9]

---

[9] "Under *Golding*, a defendant can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. . . . The first two [prongs of *Golding*] involve a determination of whether the claim is reviewable; the second two . . . involve a determination of whether the defendant may prevail." (Internal quotation marks omitted.) *State* v. *Estrella*, 277 Conn. 458, 468 n.15, 893 A.2d 348 (2006).

"The right to a jury trial in a criminal case is among those constitutional rights which are related to the procedure for the determination of guilt or innocence. The standard for an effective waiver of such a right is that it must be knowing and intelligent, as well as voluntary. . . . Relying on the standard articulated in *Johnson* v. *Zerbst*, 304 U.S. 458, 464, 58 S. Ct. 1019, 82 L. Ed. 1461 (1938), we have adopted the definition of a valid waiver of a constitutional right as the intentional relinquishment or abandonment of a known right. . . . This strict standard precludes a court from presuming a waiver of the right to a trial by jury from a silent record. . . . In determining whether this strict standard has been met, a court must inquire into the totality of the circumstances of each case. . . . When such a claim is first raised on appeal, our focus is on compliance with these constitutional requirements rather than on observance of analogous procedural rules prescribed by statute or by the Practice Book." (Citations omitted; internal quotation marks omitted.) *State* v. *Ouellette*, 271 Conn. 740, 751–52, 859 A.2d 907 (2004).

The defendant concedes that the first canvass before Judge Gold satisfied constitutional requirements. Given this concession, we are then left with only the question of whether the subsequent waiver with respect to the additional arson charge was knowing, voluntary and intelligent. This court has definitively answered this question in *Dalton*, opining that "where the judge and counsel . . . referred to the defendant's previous election waiving a jury trial, and the defendant made the same election as to all charges, the defendant's claim that his waiver was not voluntary, [knowing] and intelligent with respect to . . . all of the charges must fail." (Internal quotation marks omitted.) *State* v. *Dalton*, supra, 100 Conn. App. 235. "[W]hen a defendant knowingly, voluntarily and intelligently waive[s] his right to a jury trial and then is charged with additional crimes

to which he again elects to waive his right to a jury trial, the defendant cannot complain on appeal that his election for a court trial to the additional charges was compromised." Id., 234. In the present case, under the totality of the circumstances, and in light of our holding in *Dalton*, we conclude that the court's canvass was adequate to ensure that the defendant's waiver was knowing, voluntary and intelligent with respect to both of the arson charges, as the federal constitution requires.[10]

## IV

## COURT'S INTERVENTION AT TRIAL

We turn now to the defendant's final claim. He contends that "the court's overintervention during the trial" deprived him of his right to a fair trial under the federal constitution.[11]

The defendant did not preserve that claim at trial and now seeks review pursuant to *State* v. *Golding*, supra, 213 Conn. 239–40, or the plain error doctrine.[12] See Practice Book § 60-5. Although the defendant's claims are reviewable under the first two prongs of *Golding*, we conclude that they fail to satisfy the third prong because the record before us does not establish the clear existence of a constitutional violation. See *State*

[10] We also decline the defendant's invitation to invoke the plain error doctrine, as he has failed to "demonstrat[e] that the claimed error is both so clear and so harmful that a failure to reverse the judgment would result in manifest injustice." (Internal quotation marks omitted.) *State* v. *Myers*, 290 Conn. 278, 289, 963 A.2d 11 (2009).

[11] Again, as the defendant has failed to provide an independent analysis of his claim under the Connecticut constitution, we deem this claim abandoned and limit our review of his claim pursuant to the federal constitution. See *State* v. *Pierre*, 277 Conn. 42, 74 n.12, 890 A.2d 474, cert. denied, 547 U.S. 1197, 126 S. Ct. 2873, 165 L. Ed. 2d 904 (2006).

[12] We decline to invoke the plain error doctrine because the defendant's claim does not present the type of extraordinary situation implicating that doctrine. See *State* v. *Smith*, 275 Conn. 205, 240, 881 A.2d 160 (2005).

v. *Fabricatore*, 281 Conn. 469, 477, 915 A.2d 872 (2007) (first two *Golding* requirements involve whether claim is reviewable and second two involve whether there was constitutional error requiring new trial).

A

The defendant's principal claim is that the court's "overintervention" deprived him of his due process right to a fair trial when it summarized the theories of the parties in the presence of MacKay, an expert witness for the state, who had not yet testified. We disagree.

The following additional facts are relevant to that claim. On March 3, 2010, the defendant moved for a mistrial on the ground that the court's questioning of witnesses had raised the appearance of partiality. The defendant enumerated the instances that he believed evinced the appearance of partiality and the court responded to each in turn, ultimately explaining that "[a]ll of [its] questions were designed to elicit information that I thought was important because I was confused or unclear about . . . what the evidence was proving." While MacKay was waiting in the courtroom to testify as a rebuttal witness for the state, the court provided its rationale for its involvement with witness questioning. The court explained:

"The Court: . . . The case has been tried in what I might call a nonlinear fashion. You can figure that out. So, it's hard to follow the case. . . . [T]he case has been long and it's had breaks in it, and because of the nature of the case, it's circumstantial, a lot of the testimony is tedious, and I think the main theories of the case at this point are: The state claims that it was arson. The defendant—and this was clear from the state's case because they put in the defendant's test— the defendant's statement. And then from the defendant's case, the witness said that the—some ashes blew

out of a pipe that's in evidence and caused the fire. So, the—

"[The Prosecutor]: Your Honor, may I just—

"The Court: No, you can't interrupt me.

"[The Prosecutor]: It's just because Mr. MacKay's in the room and I don't want you—

"The Court: I don't care.

"[The Prosecutor]: Okay.

"The Court: . . . [T]here's never been any claim that the fire started in the furnace, in the firebox, so when I heard a question which seemed to—assumed that somebody had testified that the fire, that all these problems, all this fire started in the firebox, at the end of a long tedious day I reacted to that question which seemed to be taking us down a road that we didn't have to go down." In denying the defendant's motion, the court noted that "the case ha[d] been confusing at points, and if [it was] going to rule on a matter as important as this, [it] want[ed] to make sure exactly what [it was] ruling on and nothing else."[13]

"Before turning to the allegations made by the defendant, we recite certain well established principles regarding the responsibilities of the trial judge in conducting a criminal trial. Due process requires that a criminal defendant be given a fair trial before an impartial judge and an unprejudiced jury in an atmosphere of judicial calm. . . . In a criminal trial, the judge is more than a mere moderator of the proceedings. It is his responsibility to have the trial conducted in a manner which approaches an atmosphere of perfect impartiality which is so much to be desired in a judicial proceeding." (Citations omitted; internal quotation marks omitted.)

---

[13] As the defendant does not challenge the court's ruling on his motion for a mistrial, we need not explore the intricacies of that motion.

*State* v. *Robertson*, 254 Conn. 739, 769, 760 A.2d 82 (2000). "In pursuit of this goal, [t]he trial judge has the responsibility for safeguarding both the rights of the accused and the interests of the public in the administration of criminal justice." (Internal quotation marks omitted.) *State* v. *Peloso*, 109 Conn. App. 477, 489, 952 A.2d 825 (2008).

"This does not mean, however, that the trial court is merely a referee on the sidelines of the proceedings, there to ensure that the contestants observe the rules. As a matter of tradition, it is constitutionally acceptable under our system of jurisprudence for the trial judge, from time to time, to intervene in the conduct of a case." Id.

"Under [our] Anglo-American adversary trial system, the parties and their counsel have the primary responsibility for finding, selecting, and presenting the evidence. However, our system of party-investigation and party-presentation has some limitations. It is a means to the end of disclosing truth and administering justice; and for reaching this end the judge may exercise various powers. . . . Among those powers, [i]t is permissible, though it is seldom very desirable, for a judge to call and examine a witness whom the parties do not wish to call. . . .

"[W]hen it clearly appears to the judge that for one reason or another the case is not being presented intelligibly to the [finder of fact], the judge is not required to remain silent. On the contrary, the judge may, by questions to a witness, elicit relevant and important facts. . . . Such interventions may be necessary, for example, to resolve doubts as to the admissibility of certain evidence, to restrain a garrulous witness or to clarify questions that the witness may not understand. . . . Whe[n] the testimony is confusing or not altogether clear the alleged jeopardy to one side caused by

the clarification of a [witness'] statement is certainly outweighed by the desirability of factual understanding. . . . A trial judge's intervention in the conduct of a criminal trial would have to reach a significant extent and be adverse to the defendant to a substantial degree before the risk of either impaired functioning of the [finder of fact] or lack of the appearance of a neutral judge conducting a fair trial exceeded constitutional limits. . . .

"The risk of constitutional judicial misconduct is greatest in cases where the trial court has interceded in the *merits* of the trial. . . . In other words, the court may not solicit evidence that is *essential* to overcome the defendant's presumption of innocence . . . . For example, it is improper for the court, through commentary or questioning of a witness, to discredit a witness' testimony in front of a jury when the credibility of that witness is a significant issue. . . . [T]he jury has a natural tendency to look to the trial judge for guidance. Thus, the court must take great caution not to intervene in such a manner that it implies to the jury the result the court supposedly desires. . . . In the case before us, however, the judge and fact finder were one and the same. Accordingly, any appearance of partiality in the court's conduct carried less danger of prejudicing the defendant than it would have in a jury trial. . . . [I]n a nonjury case, as in an appellate court, needless or active interrogation by judges, although not always helpful, is rarely prejudicial . . . ." (Citations omitted; emphasis in original; internal quotation marks omitted.) Id., 490–93.

The defendant does not claim that the court's specific comments regarding the respective theories of the parties, made in MacKay's presence, constituted a constitutionally impermissible overintervention in MacKay's testimony, but rather that the court's comments "[were] symptomatic of a judicial attitude that is the antithesis

of what a fair trial should be." Having carefully reviewed the record in its entirety, we cannot conclude that the court's "judicial attitude" was antithetical to the constitutional guarantee of a fair trial. Moreover, the court's comments made in MacKay's presence did not discredit or pass judgment on the credibility of any witness, nor were they so significant or adverse to the defendant as to deprive him of a fair trial. We, accordingly, conclude that under *Golding*, there does not exist constitutional error requiring reversal of the defendant's conviction.

B

In addition to that principal claim, the defendant's appellate brief sets forth other general and sweeping references to alleged overintervention on the part of the court "concerning the lawn mower and gas tank . . . ." Although he incorporates by reference certain facts set forth previously in his fifty-nine page brief,[14] the defendant has failed to provide any distinct analysis through application of established law to those specific facts.

It is well established that "[w]e are not required to review claims that are inadequately briefed. . . . We consistently have held that [a]nalysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly. . . . [F]or this court judiciously and efficiently to consider claims of error raised on appeal . . . the parties must clearly and fully set forth their arguments in their briefs. We do not reverse the judgment of a trial court on the basis of challenges to its rulings that have not been adequately briefed. . . . The parties may not merely cite a legal principle without analyzing the relationship between the facts of the case and the law cited." (Internal quotation marks omitted.) *Russell* v.

---

[14] The defendant's fifty-nine page appellate brief contains more than forty-two pages of factual recitation.

*Russell*, 91 Conn. App. 619, 634–35, 882 A.2d 98, cert. denied, 276 Conn. 924, 925, 888 A.2d 92 (2005); see also *State* v. *Brown*, 256 Conn. 291, 312–13, 772 A.2d 1107 (failure to discuss application of relevant law to facts amounts to inadequate brief for purposes of appellate review), cert. denied, 534 U.S. 1068, 122 S. Ct. 670, 151 L. Ed. 2d 584 (2001); *Paoletta* v. *Anchor Reef Club at Branford, LLC*, 123 Conn. App. 402, 407, 1 A.3d 1238 (claim inadequately briefed when "legal principles that the defendants cite are not accompanied by sufficient analysis with regard to the applicability of the cited authority"), cert. denied, 298 Conn. 931, 5 A.3d 491 (2010); *In re Amanda A.*, 58 Conn. App. 451, 459, 755 A.2d 243 (2000) (claim abandoned when it receives cursory attention in brief without substantive discussion). The defendant's brief does not satisfy that fundamental prerequisite to appellate review.

Furthermore, even if we were to review the merits of the defendant's additional allegations of judicial "overintervention," he could not prevail. The applicable standard does not, as the defendant alleges in his appellate brief, entail consideration of "the effect of [the court's] actions, rather than its motivation . . . ." (Citation omitted; internal quotation marks omitted.) The cases relied on for that proposition all involved trials before a jury rather than the court. See *State* v. *Smith*, 200 Conn. 544, 512 A.2d 884 (1986); *State* v. *Fernandez*, 198 Conn. 1, 501 A.2d 1195 (1985).

In cases such as the present one involving a court trial, "[t]he issue is . . . whether the court's exercise of its common-law power to ascertain the truth exceeded the limits of that power as established by the due process clause of the United States constitution. . . . [W]hen it clearly appears to the judge that for one reason or another the case is not being presented intelligibly to the [finder of fact], the judge is not required to remain silent. On the contrary, the judge

may, by questions to a witness, elicit relevant and important facts. . . . A trial judge's intervention in the conduct of a criminal trial would have to reach a significant extent and be adverse to the defendant to a substantial degree before the risk of either impaired functioning of the [finder of fact] or lack of the appearance of a neutral judge conducting a fair trial exceeded constitutional limits." (Citations omitted; internal quotation marks omitted.) *State* v. *Peloso*, supra, 109 Conn. App. 490–91.

On the record before us, we cannot say that the defendant has established that such a constitutional violation clearly exists and clearly deprived him of a fair trial, as required by *Golding*'s third prong. As the court indicated in responding to the defendant's March 3, 2010 motion for a mistrial, its intervention served to clarify the testimony being presented. The court stated: "The case has been tried in what I might call a nonlinear fashion. . . . So, it's hard to follow the case. . . . All of my questions were designed to elicit information that I thought was important because I was confused or unclear about . . . what the evidence was proving. Like I said, the case has been confusing at points, and if I'm going to rule on a matter as important as this, I want to make sure exactly what I'm ruling on and nothing else."

As our Supreme Court has explained, "[t]he trial judge can question witnesses both on direct and cross-examination. For example, it may be necessary to do so to clarify testimony . . . . [I]t is proper for a trial court to question a witness in endeavoring, without harm to the parties, to bring the facts out more clearly and to ascertain the truth . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Fernandez*, supra, 198 Conn. 12–13. The defendant has not demonstrated that the court's intervention in the present case reached "a significant extent" and was "adverse to the

defendant to a substantial degree" so as to exceed constitutional limits.[15] (Internal quotation marks omitted.) *State* v. *Peloso*, 109 Conn. App. 491.

The judgment is affirmed.

In this opinion ALVORD, J., concurred.

FLYNN, J., dissenting. This arson conviction arises out of a major house fire that took hours to extinguish and in which several West Hartford firefighters were injured and exposed to other dangers. However serious the crime charged, those who come before this court on appeal deserve review of the issues they properly raise. I respectfully dissent from part IV of the majority opinion.

The court limited the appellant's brief to the fifty-nine pages he requested. Apparently to attempt to avoid exceeding that limit, he incorporated facts from issue II by reference in issue IV of his brief. Specifically, on page fifty-seven, he incorporated factual claims that the trial judge (1) confirmed that nobody ever examined the lawn mower; (2) then asked the rhetorical question if anybody was "ever going to testify that they examined that lawn mower?"; (3) said, in a dialogue of questions about chromatograms: "Let's go back to the lawn mower. . . . [I]f I was a fire investigator and I was investigating a fire in a basement and there was a gas

---

[15] We are, in a word, perplexed by the dissenting opinion. After noting the briefing deficiencies contained in the defendant's appellate brief, the majority nevertheless has addressed the merits of the claim under *Golding*—a claim that consists of a mere three paragraphs that begin on page fifty-eight of a fifty-nine page brief. Notably absent from the dissenting opinion is any analysis of the defendant's unpreserved claim under *Golding*'s fourth prong or conclusion as to whether reversal of the judgment of conviction is warranted. Absent such analysis, it is difficult to comprehend how the reversal of a judgment of conviction due to judicial "overintervention" is warranted under the doctrine of "full review" advanced in the dissenting opinion.

operated lawn mower in there, I think I'd take a good look at it to see if it could be a source contamination," and (4) said that he was "sitting here wondering why [the lawn mower] wasn't in the case-in-chief . . . ." The majority opinion makes no reference to these facts cited in the appellant's brief.

Appellate analysis of the fourth issue needs to address the court's suggestions as to evidence it wanted to hear because they were specifically incorporated by reference by the defendant from the earlier, page forty-three and forty-four, and also mentioned in his analysis. These facts are important because the trial was about whether the fire was due to a furnace malfunction or was intentionally set by the defendant. They are also important because the defendant's brief claims that the court's actions deprived him of a fair trial and due process of law guaranteed by the fifth and fourteenth amendments to the United States constitution. In its case-in-chief, the state's principal forensic witness, Sawyer, admitted he had not examined the lawn mower, about which the court later solicited evidence.

The most crucial appellate issue in the case arises after the court's suggestions as to what evidence it wanted to hear and the state's subsequent calling as a witness in its rebuttal case, Hennessy, a fire investigator. That testimony occurred after the court's lawn mower questions and suggestions. It was crucial because Hennessy opined that a lawn mower in the cellar had a gasoline cap removed and remnants of brown paper appeared to have been inserted into the throat of the gasoline tank. Hennessy's testimony, given after the state had rested, addressed the court's questions because he testified that he had examined the lawn mower as a source contributing to the fire.

The defendant's brief sets forth the following legal analysis of that sequential testimony as to those facts:

" 'Due process requires that a criminal defendant be given a fair trial before an impartial judge and an unprejudiced [fact finder] in an atmosphere of judicial calm. . . . It is [the trial judge's] responsibility to have the trial conducted in a manner which approaches an atmosphere of perfect impartiality which is so much to be desired in a judicial proceeding. . . .' *State* v. *Iban C.,* [275 Conn. 624], 651[, 881 A.2d 1005 (2005)]. This [c]ourt has noted that there is a 'greater risk of prejudice from [a judge's] overintervention than from underintervention,' and 'the judge should avoid trying the case for the lawyers.' *State* v. *Fernandez,* [198 Conn. 1], 11, [501 A.2d 1195 (1985)]. Moreover, '[t]he risk of constitutional judicial misconduct is greatest in cases where the trial court has interceded in the *merits* of the trial.' (Emphasis in original.) *State* v. *Peloso,* 109 Conn. App. 477, 492[, 952 A.2d 825] (2008). That is what occurred here. The court took 'an apparent position of advocacy'; [*State* v.] *Fernandez,* supra, 12; by requesting and soliciting evidence that *it* wanted to hear concerning the lawn mower and gas tank—and then enabling its production by allowing Hennessy to testify as a rebuttal witness. See *State* v. *Peloso,* supra, 492 ('the court may not solicit evidence that is "*essential* to overcome the defendant's presumption of innocence . . . ." ') (Emphasis in original.) The court's actions in soliciting that evidence were not designed for a permissible purpose like 'clarifying' or clearing up a 'misunderstanding' of testimony. Cf. *State* v. *Iban C.,* supra, 651–52. However, even if 'the court's intentions were entirely benevolent'; *State* v. *Smith,* 200 Conn. 544, 553[, 512 A.2d 884] (1986); its actions had the appearance of [partiality], and '[i]t is the effect' of its actions, rather than its 'motivation'; *id.,* that compels the conclusion that the defendant was deprived of a fair trial. This constitutional error was not harmless, because the evidence that the court solicited and encouraged was the same evidence that the

court declared to be 'the most important evidence in the case.' " (Emphasis in original.)

I respectfully urge that we review all of what the defendant properly raised. I therefore respectfully dissent from the conclusions set forth in part IV of the majority opinion because they do not rest on facts concerning the lawn mower and gasoline in its tank analyzed in the defendant's brief and its relation of legal principles to them. Particularly, the majority ignores the law established in the holding of this court in *Peloso* that "the court may not solicit evidence that is '*essential* to overcome the defendant's presumption of innocence . . . .' " (Emphasis in original.) *State* v. *Peloso*, supra, 109 Conn. App. 492. Part IV B of the majority's opinion concluded that "[o]n the record before us, we cannot say that the defendant has established that such a constitutional violation clearly exists and clearly deprived him of a fair trial, as required by [the] third prong [of *State* v. *Golding*, 213 Conn. 239–40, 567 A.2d 823 (1989)]." The defendant in *Peloso* had claimed that the court's inquiry suggesting evidence to be offered crossed the line between impartiality and advocacy in violation of the defendant's right to due process. The *Peloso* court agreed. *State* v. *Peloso*, supra, 494.

The "full review" which the majority has not undertaken would address whether the court's four questions soliciting evidence about the lawn mower and its possible relation to the fire constituted what *Peloso* concluded was " 'evidence that is *essential* to overcome the defendant's presumption of innocence' "; id., 492; which, thus, exceeded the "limits of that power" of the court to question a witness as established by the due process clause of the United States constitution. Id., 490. If analysis revealed that the questions clearly violated due process and clearly deprived the defendant

of a fair trial because the evidence sought was " *'essen-tial* to overcome the defendant's presumption of inno-cence' "; id., 492; then this court needs to determine if the state has demonstrated the lawn mower testimony elicited was harmless beyond a reasonable doubt in relation to the other evidence in the case.

This court in *Peloso* stated that "[t]he thrust of the defendant's claim is that the court exceeded its author-ity in inviting the state to elicit specific testimony from [the witness], not to clarify previous testimony or to resolve a doubt as to the admissibility of certain evi-dence, but to set forth additional substantial evidence of the defendant's guilt [and that] even if the court's proposed inquiry was framed in a neutral manner, the substantive nature of the inquiry crossed the line between impartiality and advocacy in violation of the defendant's right to due process. We agree." (Footnote omitted.) Id., 494.

In the present case the court solicited specific testi-mony from Hennessy, not to clarify previous testimony, but as additional substantive evidence essential to over-come the defendant's presumption of innocence. The court stated that: "All of my questions were designed to elicit information that I thought was important because I was confused or unclear about what the evi-dence was proving." The court also acknowledged "par-ticipat[ing] in the proof" of the case. A constitutional violation clearly exists, satisfying the third prong of *Golding* if the evidence elicited from Hennessy was essential to overcome the presumption of innocence. See *State* v. *Peloso*, supra, 109 Conn. App. 494.

Turning to the fourth prong of *Golding*, namely, whether the "state has failed to demonstrate harm-lessness of the alleged constitutional violation beyond a reasonable doubt"; *State* v. *Golding*, supra, 213 Conn. 241; I would observe that there is a distinction to be

made between a jury trial and a bench trial that informs this prong of *Golding*. If inadmissible evidence is presented to a jury, the court can instruct the jury to disregard it. "The jury are presumed to follow the court's directions in the absence of a clear indication to the contrary." (Internal quotation marks omitted.) *State* v. *Negron*, 221 Conn. 315, 331, 603 A.2d 1138 (1992). This disregarded evidence is presumed to be harmless because the jury is presumed to follow the court's recorded instruction.

This logic limps, however, when there is a bench trial and the judge solicits the evidence. If the judge does not put anything on the record that indicates that he will ignore evidence he improperly sought, a similar harmless presumption cannot be made. In the present case, the judge put no such indication on the record that he would be disregarding this evidence. To the contrary, the judge stated that this solicited evidence was important to the case. Accordingly, the issue deserves full review in light of all of the record as to whether the fourth prong of *Golding* has been satisfied. Unlike the present case, where Hennessy's testimony concerning the lawn mower as the source of the fire was admitted into evidence, the court in *Peloso* found harmlessness because the suggested evidence had not been admitted.

I would therefore conclude that the defendant's brief more than adequately set forth facts, related them to the law and established his entitlement to our full review.